IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH MIROCHA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 13 C 5724 |
| ) | |
| METROPOLITAN LIFE INSURANCE CO., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Joseph Mirocha filed suit against Metropolitan Life Insurance Company (MetLife) seeking to recover long-term disability benefits, pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B). Mirocha and MetLife have filed cross motions for summary judgment. For the reasons detailed below, the Court grants Mirocha's motion for summary judgment, denies MetLife's motion for summary judgment, and remands the case to MetLife as plan administrator for proceedings consistent with the Court's decision.

### Background

Between October 2003 and April 8, 2011, Palos Community Hospital (PCH) employed Joseph Mirocha as an electrical supervisor. As a benefit of employment, PCH offered Mirocha and other employees long-term disability (LTD) insurance through the Palos Community Hospital Welfare Benefits Plan (the Plan). This group plan was insured by MetLife, which also administered the LTD insurance and evaluated the

merits of submitted claims. The Plan grants MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." Record at MET 00296.

Under the Plan's provisions, if a beneficiary becomes disabled while covered by the Plan, MetLife will pay him monthly payments based on a set formula. A beneficiary is considered disabled if, due to illness or disease, he is receiving treatment by a physician and complying with the requirements of treatment, and is unable to earn more than eighty percent of the his pre-disability earnings in his own occupation during a ninety-day elimination period and the following twenty-four months. *See id.* at MET 00261. To be entitled to benefits, a claimant must submit documentation and establish that he is disabled within the meaning of the Plan.

Coverage under the Plan ended—making the beneficiary no longer eligible for benefits—on the occurrence of certain specific events. Most significantly for purposes of this case, coverage ends on "the date [the claimant's] employment ends." *Id.* at MET 00266. But the Plan also provides that "While [the claimant is] Disabled, the Monthly Benefit described in this certificate will not be affected if: [the claimant's] insurance ends . . . ." *Id.* at MET 00271. Thus the Plan contemplates that a claimant who loses his employment after becoming disabled is eligible for benefits even though his insurance coverage ends with his employment.

Mirocha says that by May 2010, he began experiencing weakness, pain, and instability in his right shoulder, for which he sought medical attention. On May 21, 2010, Dr. Edward Joy performed an MRI on Mirocha's right shoulder and found "[m]oderate degenerative changes," a "near full-thickness tear along the anterior margin of the

2

supraspinatus insertion," and a "SLAP tear with posterior extension."  *Id.* at MET 00119.

Mirocha's other and possibly more significant health issue involved neurological problems.  He suffered from painful headaches, and in late March 2011 he was referred for an MRI.  On March 30, 2011, Dr. Raymond Dipasqou performed an MRI on Mirocha's head.  The MRI revealed "innumerable hyperintensities of the periventricular and subcortical white matter."  The examiner, Dr. Michael Micaletti, concluded: "Impression:  1. Extensive nonspecific periventricular and subcortical white matter disease.  Considerations included demyelination.  Small vessel ischemia/vasculopathy or postinflammatory process are other possibilities."  *Id.* at MET 00118.  Mirocha says this report reveals an "extensive brain disease."  Compl. ¶ 10.

On April 8, 2011, PCH terminated Mirocha's employment.  PCH recorded the discharge as "due to Inability to do Job/Poor Work Performance."  Pl.'s Stat. of Material Facts ¶ 12. The parties disagree about what led to the termination.  MetLife contends that Mirocha was terminated for poor job performance.  It says that during the time leading up to the termination, PCH made efforts to improve Mirocha's job performance, to no avail.  Record at MET 00023.  Mirocha, on the other hand, alleges that his termination stemmed from his inability to perform his occupation due to his medical conditions.

About a year later, Mirocha obtained additional medical evaluations of his physical and mental limitations.  On June 1, 2012, Mirocha was given an MRI on his left shoulder in response to a complaint of pain, which he later claimed to be more intense than the pain from his right shoulder.  The MRI did not reveal any tears of the rotator cuff or other tendons, but the report indicates Mirocha had bicep tendonitis.  *Id.* at MET

3

00122-23.

Mirocha also applied for Social Security disability benefits and underwent two independent medical examinations as part of the application process. Clinical psychologist Dr. Joan Hakimi, who performed a psychological evaluation of Mirocha, noted that "[h]e appears to be of average intelligence and his cognitive functioning is good in all areas assessed except judgment and problem-solving, which is poor." *Id.* at MET 00176. Dr. Kimberly Middleton performed a physical examination of Mirocha. She concluded that "[t]he claimant has marked limitations of both shoulders and would not be able to perform work as an electrician. . . . His alleged spontaneous vision loss and headaches appear credible and would affect his ability to maintain gainful work." *Id.* at MET 00180.

The Social Security Administration (SSA) determined that Mirocha was disabled and that his disability began on April 1, 2011, one week before his termination from PCH and while he still had coverage under the LTD insurance.

On February 25, 2013, Mirocha applied to MetLife for disability benefits. In support, he submitted in support the MRI of his brain, the MRIs of both shoulders, Dr. Hakimi's psychological examination, Dr. Middleton's physical examination, and the SSA's determination that he was disabled as of April 1, 2011. He also submitted MetLife's application form. On this form, Mirocha described his limitations relating to his return to work as "extensive white matter brain disease, torn right shoulder, pain, fatigue, migraine headaches, periodic episodes of temporary blindness, delayed recall, confusion." *Id.* at MET 00154. Mirocha's application listed a disability onset date of April 1, 2011, the same date the SSA had found. *See id.* at MET 00149.

On March 5, 2013, MetLife denied Mirocha benefits "for the period of disability beginning April 8, 2011." *Id.* at MET 00076. MetLife's letter, addressed to Mirocha's attorney, noted that Mirocha's employment was terminated on that date, and it quoted the portion of the Plan that states that insurance ends on the date an employee's employment ends or he ceases being in an eligible class. *Id.* The next sentence of MetLife's letter stated, "*Therefore*, based on the information obtained for our review your client is not eligible for Long-Term Disability benefits." *Id.* (emphasis added). The letter made reference to the SSA's award of disability benefits, saying that MetLife had taken this into consideration but that the SSA's determination "is separate from and governed by different standards than MetLife's review and determination" under the Plan. *Id.* *However,* MetLife's letter said nothing about Mirocha's medical condition and did not explain how any difference between Social Security disability standards and the Plan's definition of disability affected things. Finally, the letter told Mirocha how and where to appeal the determination of disability and said he could submit any additional information that he deemed appropriate for proper consideration of his claim. *Id.* at MET 00077.

On April 8, 2013, Mirocha's attorney sent a letter to MetLife appealing the decision. He stated that MetLife's March 5 letter had not given specific reasons for the adverse determination, but he noted the letter's reference to the Plan provision regarding when coverage ends. *Id.* at MET 00066. Counsel stated that Mirocha was "disabled prior to his termination, was in an eligible class at the time he was diagnosed with the extensive brain disease[,] and is entitled to long term disability benefits retroactive to the date of his disability as determined by the [SSA] to be April 1, 2011."

5

*Id.* The letter cited the records supporting the contention that Mirocha was disabled as of April 1. *Id.* at MET 00071. Counsel concluded by requesting all documents related to the claim as well as any internal rule, guideline, or criterion on which MetLife had based the denial. *Id.* On May 1, 2013, a MetLife appeals specialist replied that to her knowledge, "there was no internal rule or guideline specifically relied upon in making the claim determination at issue." *Id.* at MET 00064.

Mirocha's attorney then supplemented his appeal with a second letter, dated May 7, 2013. In this letter, counsel emphasized that "[t]he plan provision upon which MetLife relies upon does not apply to the facts of Mr. Mirocha's claim because he was disabled prior to the date that his employment ended at [PCH]." *Id.* at MET 00033. Counsel also explained in greater detail why the medical evidence showed that Mirocha was already disabled prior to the time his employment was terminated. *Id.*

On May 24, 2013, MetLife rejected Mirocha's appeal. The denial letter stated that "Mr. Mirocha's benefits were denied because it was determined he was no longer in an eligible class for [long term-disability] benefits as required by the Plan." *Id.* at MET 00020. Specifically, MetLife stated, as it had in its original denial letter, that Mirocha was not eligible for benefits because he was terminated from PCH on April 8, 2011, and his coverage ended on that date. *Id.*

In the letter, MetLife also rejected Mirocha's claim that he was disabled prior to the termination of his employment. First, MetLife acknowledged the SSA's determination of disability but stated that the SSA's test for disability was different from the one set forth in the Plan. *Id.* at MET 00023. Second, MetLife emphasized that coverage under the Plan ended at the earlier of either the date on which Mirocha

ceased active work if he was not disabled or the date his employment ended. *Id.* According to MetLife, Mirocha had missed no work or pay due to his claimed disabilities. *Id.* MetLife also stated that PCH had informed MetLife that Mirocha had used a total of only four sick days in the sixteen months prior to termination and that his termination was performance-based. *Id.* MetLife also noted that even though the SSA determined Mirocha was disabled as of April 1, 2011, he had continued to work for another week after that date. *Id.*

Mirocha, through his attorney, sent MetLife another letter on June 24, 2013, addressing the points MetLife had relied upon in its denial of his appeal. *See id.* at MET 00003. In particular, counsel provided information confirming that Mirocha had obtained permission to leave work early on March 24, 2011 due to pain, had consulted with his doctor, and was referred for the aforementioned MRI. Counsel stated that Mirocha "did not know what was wrong with him" and attempted to work through his health-related issues, which was why he remained at work through April 8, 2011. *Id.* at MET 00004. Counsel further stated that Mirocha "made doctor appointments as soon as he learned of the brain disease and saw a neurologist specialist[,] but he was terminated before the appointments were scheduled and had no time or ability to understand the extent of his health problem and could not simply stop working." *Id.* Counsel noted that MetLife's letter had erroneously stated that the MRI report post-dated his termination, *see id.* at MET 00022; in fact it predated the termination and thus "substantiates Mr. Mirocha['s] claims that he was disabled prior to his termination." *Id.* at MET 00004.

MetLife declined further review. *See id.* at MET 00001. Mirocha then filed the present suit.

**Discussion**

Mirocha and MetLife have filed cross motions for summary judgment, which are governed by Federal Rule of Civil Procedure 56. *Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.,* 427 F.3d 1038, 1041 (7th Cir. 2005). To be entitled to summary judgment, the moving party must show that "'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Diaz v. Prudential Ins. Co. of Am.,* 499 F.3d 640, 643 (7th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)).

**1.    Standard of review**

The first issue involves the standard under which the Court reviews MetLife's decision denying Mirocha's claim for long term disability benefits. Under ERISA, the default standard of review is *de novo*, unless the governing plan expressly gives the administrator the discretion to determine eligibility and to interpret the terms of the contract. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 102 (1989). If the plan does so, then a court reviews the plan administrator's decisions for abuse of discretion.

Both sides agree that the Plan gave discretion to MetLife to determine eligibility and to interpret the terms of the insurance contract. Mirocha argues, however, that certain factors require *de novo* review. First, Mirocha argues that MetLife had a conflict of interest because it both evaluated claims to determine whether to grant benefits and was responsible for paying granted claims. Yet a conflict of interest does not change the standard of review; rather, it is a factor in how a court applies the abuse of discretion standard (assuming that is the standard that otherwise applies). *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008). Second, Mirocha asks the Court to apply a line of Eighth Circuit cases that provide for *de novo* review if the plaintiff can show there was a

conflict of interest and that major procedural irregularities "caused a serious breach of the plan administrator's fiduciary duty" toward the beneficiary. *See, e.g., Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160-61 (8th Cir. 1998). The Court notes that the Eighth Circuit itself appears no longer to consider *Woo* to be good law in light of the Supreme Court's later decision in *Glenn*. *See Hackett v. Std. Ins. Co.*, 559 F.3d 825, 830 (8th Cir. 2009) ("In *Glenn*, the Supreme Court made clear the conflict does not change the standard of review . . . . Rather, a conflict should be weighed as a factor in determining whether there is an abuse of discretion.") (internal quotation marks omitted). In any event, the Seventh Circuit has not adopted the earlier Eighth Circuit test, and it has dealt with similar procedural violations under the abuse of discretion standard of review. *See, e.g., Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691-93 (7th Cir. 2010). In short, neither of Mirocha's arguments justifies *de novo* review.

Under the abuse of discretion standard, a court defers to the plan administrator's determination of disability. *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003) ("[T]he court is not in the place to make the determination of entitlement to benefits."). Nevertheless, the abuse of discretion standard "is not a euphemism for a rubber-stamp." *Majeski v. Metro. Life Ins. Co.,* 590 F.3d 478, 483 (7th Cir. 2009); *see also Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996) ("Deferential review is not no review; deference need not be abject."). A court considers whether there was a reasonable basis for the administrator's determination; a court will not uphold the adminsitrator's decision "when there is an absence of reasoning in the record to support it." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). In addition, a violation of ERISA's procedural

9

requirements can undercut an administrator's determination. ERISA requires that "'specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for full and fair review by the administrator.'" *Id.* (quoting *Tate v. Long Term Disability Plan for Salaried Emps. of Champion Int'l Corp. No. 506,* 545 F.3d 555, 559 (7th Cir. 2008)).

**2.    The denial of benefits**

Mirocha's last day of work—April 8, 2011—was his last day of insurance coverage, because insurance coverage under the Plan ends by "the date [the claimant's] employment ends." Record at MET 00266. Thus to qualify for benefits, Mirocha had to show he was disabled on or before that date. As indicated earlier, the Plan defines disability as the inability to earn "during the Elimination period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy." *Id.* at MET 00261.

MetLife's initial denial letter stated that Mirocha was not entitled to benefits for the period starting on April 8, 2011 because on that date he was no longer employed and thus no longer covered. The only other pertinent comment in the initial letter was that the SSA's determination of disability was governed by a different standard from the one used in the Plan. MetLife did not explain or elaborate on this point, nor did it address whether Mirocha was disabled prior to his April 8, 2011 termination, even though his application claimed a disability date of April 1, 2011. *See* Record at MET 00149.

MetLife's letter denying Mirocha's appeal did a slightly better job of dealing with the issues raised by Mirocha, but not by much. The letter repeated MetLife's earlier

10

statements that Mirocha was ineligible because his coverage had ended on April 8, 2011, the date he was terminated, and that the SSA's determination was governed by a different standard. This time, however, MetLife directly addressed Mirocha's claim that he was disabled prior to the termination of his employment. MetLife rejected this contention citing non-medical evidence, specifically that Mirocha had not missed work due to his claimed disability, that he had used only four sick days in the preceding sixteen months, that he had continued to work for a week after the SSA had found him to be disabled, and that he had been terminated for performance-related reasons. MetLife did not address the medical evidence Mirocha had submitted other than by way of a brief, passing summary of points Mirocha's attorney had cited in his appeal request.

3.  **Whether MetLife abused its discretion**

Mirocha claims to have been disabled as of April 1, 2011, one week before he lost his job. In seeking entry of summary judgment, MetLife argues that Mirocha did not satisfy the policy's definition of disability. Its first argument is that Mirocha was earning 100 percent of his predisabiity earnings from the date he claims to have become disabled (April 1) until his termination on April 8, 2011 and thus could not meet the Plan's definition of disability. MetLife characterizes the Plan as requiring the claimant to be "unable to earn more than 80% of his Predisability Earnings in his Own Occupation." Def.'s Mem. in Support of Mot. for Summ. J. at 1. MetLife argues that because Mirocha was earning 100 percent of his predisability earnings through April 8, he could not possibly meet the 80-percent-or-less requirement. *See id.* at 8 ("Mirocha's receipt of 100% of his Predisability Earnings from work in his Own Occupation prevents him from satisfying the Plan's definition of Disability."). *See also* Def.'s Resp. to Pl.'s Cross Mot.

11

for Summ. J. at 1.

This argument represents a blatant misreading—or, to be more charitable, a complete misunderstanding—of the Plan's definition of disability. The definition's eighty percent standard does not require a claimant to show that he is not earning eighty percent of his predisability earnings as of the date he claims to have become disabled. In fact, it does not say anything close to that. Rather, it says the claimant must be unable to earn, "*during the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation . . . .*" Record at MET 00261 (emphasis added). In other words, the eighty percent requirement covers a period extending *over two years*. MetLife's contention in its summary judgment papers that Mirocha does not qualify because he earned 100% of his Predisability Earnings for *one week* after the date he claims disability borders on the frivolous.

MetLife's second argument is equally specious. It asks the Court to grant summary judgment in its favor on the theory that Mirocha's claim of disability is inconsistent with a contention he has made in an disability discrimination lawsuit that he has filed against PCH, specifically that he was still able to work as of the date of his termination. *See* Def.'s Mem. in Support of Mot. for Summ. J. at 2, 7. MetLife offers nothing to suggest, however, that it had any information about this at the time it denied Mirocha's claim. The law is clear that in evaluating a plan administrator's decision under the abuse of discretion standard, a court "consider[s] only the evidence that was before the administrator when it made its decision." *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 462 (7th Cir. 2001). Thus consideration of this point by the Court is

inappropriate.

In addition to the arguments just discussed, MetLife argues that Mirocha did not present sufficient proof of disability. This, the Court notes, is a point the administrator did not make or even address. Mirocha contends that MetLife's denial of benefits was arbitrary and capricious and an abuse of discretion because it offered no explanation for disregarding his medical evidence, failed to explain why SSA's determination of disability did not matter, and operated under a conflict of interest. Mirocha also contends that MetLife failed to provide adequate notice of its decision-making process and provided no guidance on how Mirocha might perfect his claim on appeal, as required by ERISA. With these arguments in mind, the Court proceeds to evaluate whether MetLife abused its discretion in denying Mirocha's claim.

In rejecting the claim, MetLife cited non-medical evidence, specifically that Mirocha had not missed work due to his claimed disability; he had continued to work for a week after the SSA had found him to be disabled; he had used only four sick days in the preceding sixteen months; and he was terminated for performance-related reasons. The first two of these points are rather difficult to credit, in light of the fact that Mirocha claimed a disability date that was only one week before his termination. Given this short interval, it is difficult to see the logic in MetLife's determination that Mirocha's lack of absences undercut his claim of disability. If nothing else, his claimed disabilities were not necessarily the type that would immediately preclude him from working. In any event, MetLife's reliance on this point assumes that he and PCH would have realized that he was disabled immediately on the date of onset. To the contrary, a week is a relatively short time for an employer to determine that an employee's job performance is

sufficiently subpar to warrant termination. And as the Court noted earlier, under the Plan's language, the inability to earn eighty percent of pre-disability earnings is measured in relation to the elimination period and the twenty-four months thereafter—not the last few days before the employee stopped working.

MetLife's reliance on the fact the PCH terminated Mirocha for performance-related reasons and on his lack of sick days is also difficult to take seriously. The justification that PCH gave for the termination does not undercut a finding of disability in the least. Indeed, it is entirely possible that poor job performance could have resulted from limitations imposed by Mirocha's medical condition. Thus bare reliance on PCH's stated reason for termination does not support a finding of non-disability, and MetLife does not appear to have conducted any further assessment or to have looked beyond the surface. In addition, given the fact that Mirocha claimed in his application for benefits that he became disabled only one week before he lost his job, the fact that he had taken only four sick days in the previous sixteen months would seem to be beside the point.

In short, even taken on its own terms, MetLife's stated reason for the denial of benefits is quite weak. The Court thus proceeds to address Mirocha's criticisms summarized earlier.

Mirocha argues that MetLife failed to consider the medical evidence regarding his disability and instead selectively relied on evidence supporting denial. ERISA does not require a plan administrator to give special deference to medical opinions submitted by the claimant. See *Holmstrom*, 615 F.3d at 774. Yet even under the abuse of discretion standard of review, "[a]dministrators may not arbitrarily refuse to credit a claimant's

reliable evidence." *Id.*

Mirocha provided MetLife with the Dr. Dispasquo's MRI of his brain showing "[e]xtensive . . . white matter disease," Dr. Hakimi's psychological examination finding Mirocha to have poor problem-solving judgment, MRIs of both shoulders showing signs of physical limitations, and Dr. Middleton's physical examination in which she concluded that Mirocha "would not be able to perform work as an electrician." Record at MET 00180. MetLife did not address any of this evidence in denying Mirocha's claim either initially or on appeal, and it cited no countervailing medical evidence of any kind, let alone evidence that would undercut Dr. Middleton's opinion that Mirocha could not perform his work as an electrician. The medical records that Mirocha offered suggest the sort of occupational limitations that might render him disabled within the meaning of the Plan.

Though MetLife may not have been compelled to find a disability on the basis of this evidence, it could not arbitrarily refuse to credit the evidence given its apparent reliability. But that is exactly what MetLife did. Worse, MetLife appears to have ignored Mirocha's medical evidence altogether. Instead, it cherry-picked non-medical evidence that supported a denial of benefits. In denying Mirocha's appeal, MetLife noted that Mirocha continued to work for a week after the beginning of his alleged disability, that PCH terminated Mirocha for performance reasons, and that he took no significant sick leave prior to the end of his insurance coverage. All of that might have been relevant, but it did not entitle MetLife to ignore the medical evidence.

An additional flaw in MetLife's decision-making is that the company made no attempt to explain its disregard of the SSA's determination that, as of April 1, 2011,

15

Mirocha was unable to perform not only his own job, but any job. "An administrator is not forever bound by the Social Security determination of disability, but an administrator's failure to consider the determination in making its own benefit decisions suggests arbitrary decision making." *Holmstrom*, 615 F.3d at 772-73. This suggestion is heightened when the SSA's standard of disability is more stringent than the plan's, which is the case here. *Id.* at 773.

In addressing the SSA's disability determination, MetLife said only that the Plan used a different standard. *See* Record at MET 00023. This was a boilerplate rejection that did not explain or even suggest why any differences in the standard warranted disregarding the SSA's disability determination. Indeed, the standard for disability that the SSA applied is actually more stringent that the Plan's standard: disability under Social Security law requires a person to be unable to perform any occupation, whereas the Plan required occupational disability only in Mirocha's one's own occupation. The omission of any discussion of this point or, for that matter, anything about the substance of the SSA disability finding determination suggests arbitrary decision-making on the part of MetLife.

Mirocha also argues that MetLife operated under a conflict of interest that the Court should consider in reviewing the decision. An administrator is under a conflict of interest if it "both funds the plan and evaluates the claims," which is the case here. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). As noted earlier, a conflict of interest of this sort is a factor that a judge must consider when determining whether a plan administrator has abused its discretion. *Id.* at 117.

In *Holmstrom*, the Seventh Circuit recognized that certain actions or behavior by

16

an administrator suggests that a conflict of interest improperly influenced its decision. *Holmstrom*, 615 F.3d at 777. First, selective use of evidence not only suggests arbitrary decision-making, but also that the conflict of interest influenced the decision. *Id.* Likewise, in a disability insurance case, an unexplained rejection of the SSA's determination of disability also suggests that the plan administrator's conflict of interest affected its decision. *Id.*

As explained above, MetLife never directly addressed Mirocha's evidence. Rather, it selectively relied on (among other things) the fact that PCH terminated Mirocha's employment for performance reasons, without any apparent consideration of whether poor job performance might have resulted from the conditions that Mirocha says were disabling. Similarly, with regard to the SSA's determination that Mirocha's disability began before his MetLife insurance coverage ended, MetLife merely pointed to the claimed difference in the governing standards, without explaining why those differences mattered in Mirocha's case.

In short, MetLife's behavior suggests that its conflict of interest did, in fact, affect its decision-making in Mirocha's case. A conflict of interest can act as "as a tiebreaker when the other factors are closely balanced." *Glenn*, 554 U.S. at 117. Here, for the reasons described earlier, it is not clear that any tiebreaking is needed in order for Mirocha to prevail in this lawsuit. But if it is needed, the tiebreaker is present.

For the reasons stated, the Court concludes that MetLife abused its discretion and acted arbitrarily and capriciously in denying Mirocha's claim for benefits. The reasons it cited for rejecting Mirocha's claim were non-pertinent, unexplained, or actually cut the other way, and it selectively relied on points supporting denial while

ignoring evidence that Mirocha had offered to support his claim.

Because the Court has concluded that MetLife abused its discretion, it need not address Mirocha's additional contentions that MetLife violated ERISA's procedural requirements.

**4.    Remedy**

"In a case where the plan administrator did not afford adequate procedures in its initial denial of benefits, the appropriate remedy respecting the *status quo* and correcting for the defective procedures is to provide the claimant with the procedures that she sought in the first place." *Hackett,* 315 F.3d at 776. Thus, when reviewing an initial claim of disability, the appropriate remedy typically is to remand the claim to the insurance agency. *Majeski,* 590 F.3d at 484.

Because Mirocha has never been determined to be disabled under the Plan, it is appropriate to remand his claim to MetLife for a proper determination of disability. In some situations, courts have awarded benefits to a plaintiff whose claim of disability was arbitrarily denied. Courts have tended to order this in two situations. First, if the arbitrary decision canceled benefits that the beneficiary already had been receiving for a long-term disability, then courts sometimes require the plan to resume payments. *See Schneider*, 422 F.3d at 629-30. Second, an award of benefits by the reviewing court is appropriate if the evidence is "so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Kough v. Teamsters' Local 301 Pension Plan*, 437 Fed. App'x 483, 488 (7th Cir. 2011) (quoting *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009)); *see also Majeski*, 590 F.3d at 484. Neither situation exists here. Mirocha did not receive disability

benefits from MetLife, temporarily or otherwise, and it is not clear from the present record that he is entitled to receive benefits. The determination should be made in the first instance by the Plan's administrator.

5.  **Attorney's fees**

Mirocha ask the Court, in the event of an order for benefits or a remand, to award him reasonable attorney's fees under 29 U.S.C. § 1132(g)(1), which permits a court to award "a reasonable attorney's fee and costs of action to either party" in an ERISA case. The Court is remanding the matter, however, not entering a judgment for Mirocha that awards him benefits. The appropriate time to request attorney's fees is after a final judgment is entered  See Krupp v. Liberty Life Assur. Co. of Boston, 936 F. Supp. 2d 908, 920 (N.D. Ill. 2013). The Court therefore denies Mirocha's request for attorney's fees, without prejudice to renewal.

## Conclusion

For the foregoing reasons, the Court grants plaintiff's motion for summary judgment [dkt. no. 22] and denies defendant's motion for summary judgment [dkt. no.16]. The Clerk is directed to enter judgment vacating the Plan administrator's denial of plaintiff's claim for disability benefits and remanding the claim to the administrator for further proceedings consistent with the Court's decision.

                                                        _____
                                                         MATTHEW F. KENNELLY
Date:  July 18, 2014                                       United States District Judge